Filed 10/31/22 P. v. Truong CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C094793 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE012198) |
| v. | |
| HIEU THAI TRUONG, | |
| Defendant and Appellant. | |

Hieu Thai Truong was convicted by a jury of assault with a firearm. Defendant admitted he shot the victim, but argued he did so in self-defense. On appeal, defendant argues (1) the trial court abused its discretion in admitting evidence that five guns were found in his house, none of which was the gun used to shoot the victim, (2) the prosecutor committed misconduct during closing argument when he stated defense counsel had dragged the victim through the mud, and (3) these two errors, either singly or cumulatively, justify reversal of his conviction. He also challenges the imposition of certain assessments and fines on various grounds. We agree with defendant's claim

1

regarding the trial court's failure to orally pronounce certain mandatory assessments, but in all other respects, we affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

Mario Cruz was doing remodeling work on the house next door to defendant's house. The work included clearing bushes from the front and back yards, and it appears that some debris ended up in defendant's yard or that Cruz cut some of defendant's bushes. According to Cruz, "I was cutting [bushes in] the backyard, and [defendant] became angry with me because . . . I cut something that was hanging on his side, the side of his house." Cruz also testified defendant "[a]sk[ed] me why I cut the flowers and why I made that mess that fell in his backyard." This dispute over bushes led to escalating altercations between the two men over the course of three days, and these altercations ultimately culminated in defendant shooting Cruz in the leg and the hand.

The first altercation occurred on June 26, 2017, and did not turn physical. According to Cruz, defendant "just yell[ed] at me with a bad attitude."

The next day, Cruz was working in the front yard and defendant came outside and told him to stop. According to Cruz, defendant appeared like he wanted to fight, and he "was in my face," so "I pushed him." Defendant "stumbled back" or "sideways," landed on his knees, and got back up. Defendant then made a gesture "as if he were going to take out a weapon" from his waistband. According to Cruz, defendant "became more angry, and then he grabbed a . . . big rock." "I thought he was gonna throw it at me, but . . . he threw it across the street and almost hit [my] truck. [¶] . . . [¶] [A]nd then he started saying that he was going to call the police to have them come arrest me." Defendant did call the police, and two officers arrived about 20 to 30 minutes later. After talking to both men, the officers "determined that it was a mutual-combat event, where both subjects . . . would be subject to citizen's arrest by the other party." Defendant and Cruz declined to press charges, and the officers left.

2

Later that day, Cruz and his son were working in the front yard when defendant came back, this time accompanied by someone described only as a tall white man (we will refer to him as defendant's friend). Defendant ran up to Cruz and started hitting him, and Cruz's son tried to pull defendant off his father. Defendant's friend then grabbed Cruz's son and started choking him. In the meantime, defendant hit Cruz around six times before Cruz pushed him down. The fight ultimately ended, and defendant and his friend went back into defendant's house. Cruz called the police, and they came back out to the scene. The officers observed redness and red marks on Cruz's son's neck and a laceration on his lip and they took pictures of his injuries. They knocked on defendant's door but no one answered, and they were unable to locate him.

The next morning, Cruz returned to the job site alone with plans to return some rented heavy equipment. Defendant came out of his house and, according to Cruz, started "making fun of the beating [my son] had received from that other man" the day before. Cruz "told him to be quiet and to not be saying that because . . . his problem was with me, not with my son." According to Cruz, "We were both on guard," and "we . . . wanted to fight." He testified, "I was ready to defend myself," and "I took my shirt off, and I was gonna fight with him." Then, however, "I think he [i.e., defendant] was scared, and he started to run, and I started to chase him." Cruz testified he chased defendant for "a few seconds," and then "I thought, 'Okay. He started running. He doesn't want to do anything'. So I went back to [work]." "I tried [to catch him], but since he left, I went back to work." Cruz testified there were "no weapons" involved up to this point.

Defendant went into his house and then came back outside with a baseball bat, ran toward Cruz, and swung the bat at him once but missed. Right before defendant swung the bat, Cruz ran to his truck and grabbed a "metal scraper" in order to "defend" himself,

3

but he dropped it "[w]hen the bat was coming" at him.[1]  Cruz testified he never struck or hit defendant with the metal scraper.  Defendant ran back into his house and Cruz went back to work.

Defendant reappeared a short time later carrying a handgun.  Cruz stated defendant came "running" towards him, tripped and fell in his driveway, then stood up and pointed the gun at him.  When he was about 20 feet away, he shot Cruz twice—in the leg and in the hand.  Cruz testified he was not holding the metal scraper or anything else that could be used as a weapon when defendant pointed and fired the gun; he also testified he was not making any threats, and he was not charging or running at defendant.  Neighbors provided Cruz with first aid, and he was ultimately transported to the hospital where he had surgery on his hand.

A neighbor named Daniel Fernandez witnessed the shooting and the events leading up to it.  He testified he heard two men arguing outside his house, and he looked out his window and saw defendant and Cruz across the street.  He could tell they were arguing by the volume of their voices, but he could not hear what they were saying.  He saw "a lot of hand movement, pointing, arguing, shouting," but no physical contact and no weapons.  He then saw defendant go inside his house and come back out with a baseball bat.  Defendant walked up to Cruz "aggressively" and with a "very angry" expression on his face, swung the bat at Cruz, and hit him on the upper arm.  Defendant then went into his house, and came back out about a minute later "holding a pistol in his right hand."  Fernandez saw defendant raise the pistol and fire two shots.  Although Cruz was out of his view when the shots were fired, Fernandez immediately looked down the street and got "a short glimpse" of Cruz, "who seemed to hunch over, and then I lost sight

_____

[1]  Cruz's testimony on this point was unclear, and it is possible the bat hit the metal scraper, because he testified, "I didn't grab it [i.e., the metal scraper] well, because I felt the bat first, and I went backwards."

4

of him." Fernandez testified he never saw Cruz with a baseball bat, a firearm, a scraper, a metal pole, or anything like that, and it did not appear to him that Cruz was ever aggressive or physically threatening to defendant. From Fernandez's perspective, defendant was the aggressor during the entire incident, and Fernandez did not see anything that would explain why defendant got a gun or shot Cruz.

The police searched defendant's house and located five guns inside a gun safe, none of which were used in the shooting. The police never found the gun used in the shooting.

Defendant does not dispute he shot Cruz, but he contends he did so in self-defense. Although defendant did not testify, he supports his self-defense claim by citing the testimony of a neighbor named Spencer Edwards. Edwards heard (but did not see) the gunshots. Right after hearing the gunshots, Edwards "looked down the street" and saw defendant holding a gun and Cruz standing about 20 feet away. Edwards ultimately approached defendant, and he testified defendant "said he was in fear for his life," and "said it three times." Edwards also testified defendant appeared to have "little scratches" on his hands and arms "kind of like when you slide into first in baseball," and a bloodshot eye.

Defendant was charged with attempted murder (Pen. Code, §§ 664, 187, subd. (a)), assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b)), and various enhancements.[2] Following a jury trial, he was found not guilty of attempted murder and guilty of assault with a semiautomatic firearm. The jury also found true a personal infliction of great bodily injury enhancement and a personal use of a firearm enhancement. On September 3, 2021, the trial court sentenced defendant to an aggregate term of nine years in state prison, and imposed various assessments and fines.

---

[2] Further undesignated statutory references are to the Penal Code.

5

On September 7, 2021, defendant filed a timely notice of appeal.

## DISCUSSION

### I

### *Evidence of Other Guns*

Defendant argues the trial court erred in admitting evidence that other guns were found when the police searched his house, either because such evidence was not relevant, or because it should have been excluded under Evidence Code section 352. He also argues the error was compounded when the prosecutor stated during closing arguments that defendant had an "arsenal" of guns in his house. He contends the challenged evidence and the prosecutor's characterization of the guns as an arsenal portrayed him "as some 'gun nut' who was quick to pull the trigger and who was looking to escalate a physical altercation into a potentially deadly one." Finally, he argues the error in admitting the challenged evidence was prejudicial and thus requires reversal. We disagree on all counts.

A. *Additional relevant facts*

During a pretrial hearing to discuss in limine issues, defense counsel stated the police executed a search warrant at defendant's house and found a "large number" of guns, but they did not find the gun used in the shooting. Defense counsel argued that evidence the police found other guns in the house should be excluded either because it was not relevant (i.e., because none of the other guns were used in the shooting), or because, pursuant to Evidence Code section 352, "the prejudicial effect significantly outweighs any probative value."

The prosecutor responded, "The People aren't seeking this to show that the Defendant has some kind of propensity . . . for being a major gun enthusiast or anything of that nature." Instead, the evidence was relevant to show "consciousness of guilt" because "after shooting the victim . . . the Defendant then runs back into his residence with that same firearm . . . , stays in that residence with that firearm, and then when he

6

next reappears and resurfaces from the residence, he no longer has that gun. The People's contention is that he hid and suppressed that firearm." Defense counsel then argued consciousness of guilt could be shown by the fact the gun used in the shooting was not found in the house, but the presence of *other* guns in the house did *not* show consciousness of guilt.

The trial court ruled as follows: "The People may present evidence that the search warrant was executed, that firearms were found. . . . I do think it's relevant or pertinent to the People's position that they be able to establish that the Defendant . . . returned to the house after the shooting with the gun, that . . . the place was searched. Firearms were found but not 'the' gun which was used, because it does show consciousness of guilt. [¶] I don't see any undue prejudice of any kind, and I do find it relevant as to the consciousness of guilt." The trial court did, however, exclude photographs of the other guns: "You just don't need the photographs. No one is disputing that the guns were found. [¶] To the extent that [defendant's] concern gets any traction would be the fact that the jury would be presented with firearms that may suggest . . . some sort of predisposition toward weapons or something like that."

At trial, two police officers testified they searched defendant's house to look for the gun used in the shooting. They located .45-caliber shell casings in the area where the shooting occurred, and were thus looking for a .45-caliber gun. They found three handguns and two or three rifles inside of a locked metal gun safe in the master bedroom,[3] all registered to defendant, but none were the gun used in the shooting. The trial court sustained an objection by defense counsel when officers attempted to testify about the rifles because "[t]he rifles aren't relevant," but it did allow them to testify about the handguns.

---

[3] One officer testified they found five guns, and the other testified they found six guns. Neither party suggests this discrepancy is relevant.

The police testified they found a .45-caliber Glock semiautomatic pistol and .45-caliber Glock ammunition and magazines; a Smith and Wesson revolver in a zippered case with bags of ammunition; and a .556-caliber pistol with accompanying .556-caliber ammunition and magazines. They determined the Glock was not the gun used to shoot Cruz because its magazine was full, it was clean and did not appear to have been recently fired, and it did not smell like gunpowder.[4] The police also found three fully loaded magazines for a Springfield .45-caliber semiautomatic pistol, and two Springfield-branded magazine holders, each with space for two magazines, which suggested one magazine was "unaccounted for." One of the Springfield magazines was found in a pair of pants hanging on the master bedroom door, along with a wallet containing defendant's driver's license. Finally, the police found a Springfield-branded holster for a .45-caliber gun, but "that gun was missing from the holster." They did not find a .45-caliber Springfield gun in the house, and they never found the gun used to shoot Cruz.

During closing argument, the prosecutor referred to these other guns as an *arsenal*: "Officers testified that there was an *arsenal* that they found in the Defendant's master bedroom" (italics added), and "he's got an *arsenal*" (italics added).

B. *Analysis*

We review the trial court's ruling on the admissibility of evidence for an abuse of discretion. (*People v. Merriman* (2014) 60 Cal.4th 1, 74.) "We will affirm the trial court's evidentiary ruling if it is correct on any theory of law applicable to the case, even if for reasons different than those expressly stated by the trial court." (*People v. Fruits* (2016) 247 Cal.App.4th 188, 205.) If there was no error in admitting the evidence, the inquiry ends. Even if there was error, reversal is not required unless the error was prejudicial. (Evid. Code, § 353; *People v. Avitia* (2005) 127 Cal.App.4th 185, 194.)

---

[4] Ballistics testing confirmed the Glock was not used in the shooting.

8

Defendant first argues the evidence regarding other guns was not relevant. We disagree.

Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) In this case, one of the primary disputed facts (if not *the* primary disputed fact) was whether defendant shot Cruz in self-defense. Accordingly, evidence having any tendency in reason to prove or disprove self-defense is relevant.

The prosecutor argued defendant did not shoot Cruz in self-defense, and he supported his argument by highlighting evidence that showed defendant got rid of the gun he used to shoot Cruz, which showed a consciousness of guilt. The jury was given CALCRIM No. 371, which instructs, "If the Defendant tried to hide evidence, that conduct may show that he was aware of his guilt." The prosecutor thus argued, "A justified self-defense claim, you don't throw away the gun. . . . [I]f you think [you] . . . are justified in shooting somebody else, you don't throw away the gun. You don't hide it. You don't suppress it. [¶] And that shows he is aware of his own guilt. . . . [H]e knows that this isn't self-defense." This argument was a cornerstone of the prosecution's case.

Defendant acknowledges that evidence he hid or otherwise got rid of the gun he used to shoot Cruz would be relevant to show consciousness of guilt. As he did in the trial court, however, he argues the fact he had *other* guns in the house does not tend to prove he tried to hide the gun he used to shoot Cruz. Although this argument is colorable especially in the abstract, we ultimately disagree given the state of the evidence and the prosecutor's arguments about that evidence.

The prosecution's theory was that defendant retrieved a .45-caliber Springfield handgun from his house, shot Cruz with it, and then hid or otherwise disposed of the gun, which showed consciousness of guilt. During closing argument, the prosecution explained why evidence about other guns was relevant to that theory. As noted above,

9

the police were looking for a .45-caliber gun because they found .45-caliber casings at the scene. When police searched defendant's house they found an empty Springfield-branded holster for a .45-caliber gun, three fully loaded magazines for a Springfield .45-caliber gun (one of which was found in defendant's pants), and two Springfield-branded double magazine holders. The fact that police found an empty Springfield-branded holster for a .45-caliber gun suggested a Springfield .45-caliber gun was missing; and the fact that they found two Springfield-branded double magazine holders with space for four magazines, but only found three magazines, suggested one magazine was missing. Evidence regarding the Springfield-branded ammunition and paraphernalia in defendant's bedroom and his pants was highly relevant to the prosecution's theory that defendant hid or disposed of a Springfield .45-caliber gun because he was aware he was not justified in shooting Cruz.

Evidence about the other guns had at least some relevance to the prosecution's theory. Officers testified they found a .45-caliber Glock semiautomatic pistol together with .45-caliber Glock ammunition and magazines; a Smith and Wesson revolver in a zippered case with associated bags of ammunition; and a .556-caliber pistol with associated .556-caliber ammunition and magazines. As the prosecutor emphasized in his closing argument, this evidence was relevant because it showed defendant kept each of his guns together with its associated ammunition. This, in turn, buttressed the prosecution's theory of the case because it suggested that if the police found Springfield-branded .45-caliber magazines and a Springfield-branded holster in the house, that meant defendant had a Springfield .45-caliber gun, and the fact that the police did not find a Springfield .45-caliber gun in the house was circumstantial evidence that defendant somehow disposed of it, which showed consciousness of guilt.

Here is how the prosecutor actually tied the other guns to his overall theory during closing argument: "[W]e . . . know there is a consciousness of guilt here on the Defendant's part . . . [b]ecause he hid . . . the gun that was used . . . . [¶] . . . [¶] How do

10

we know he did that here?  *Officers testified that there was an arsenal that they found in the Defendant's master bedroom, and that each of --* this is important, *that each of those firearms had their accompanying associated magazines and ammunition.* [¶] *He's got a .45-caliber Glock. It's got .45-caliber stuff. .45-caliber magazines -- Glock magazines, right? . . . The man is organized. I will give him that, right?* [¶] And so he's got an arsenal of all this, and each of these are registered . . . and yet the gun that we know he fired . . . cannot be located. . . . [¶] . . . [¶] . . . How do we know what kind of gun it is? [¶] Well, first we know that . . . two .45-caliber casings . . . were found right in that front yard . . . . [¶] So you heard officers say they went and searched for a .45 caliber, and there was one found. A Glock. But we know that that Glock wasn't the one used. They examined it. They looked for gunpowder, and you also heard from our criminalist that he tested that gun, right? And it . . . didn't produce the same pattern as the . . . casings found. [¶] So we know that that Glock wasn't it. . . . *So we are still looking for a .45-caliber weapon because of the casings.* [¶] *Do we know what brand it is? Circumstantial evidence tells us yes. Knowing the Defendant and his arsenal, knowing how OCD and how organized he is, that every gun has its own affiliated magazines, branded magazines, it's not a coincidence here that officers found in his master bedroom two double mag holders for Springfield branded ammunition, right?*" (Italics and underlining added.) The prosecutor's argument on this issue explains how evidence about the other guns has a tendency in reason to prove defendant shot Cruz with a .45-caliber Springfield gun, and then hid that gun, which, in turn, has a tendency in reason to prove defendant knew the shooting was not justified.

Defendant argues that even if the challenged evidence was relevant, it should nonetheless have been excluded pursuant to Evidence Code section 352 because it was unduly prejudicial. We disagree.

Evidence Code section 352 gives the trial court discretion to exclude relevant evidence if "its probative value is substantially outweighed by the probability that its

11

admission will . . . create substantial danger of undue prejudice." (Evid. Code, § 352.) "The weighing process under [Evidence code] section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules." (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314.) "The court's exercise of discretion under Evidence Code section 352 will not be disturbed on appeal unless the court clearly abused its discretion, e.g., when the prejudicial effect of the evidence clearly outweighed its probative value." (*People v. Brown* (1993) 17 Cal.App.4th 1389, 1396.) We are not convinced the trial court abused its discretion in admitting the challenged evidence.

The evidence that was admitted was quite limited. The trial court did not permit the prosecution to introduce the guns themselves or pictures of the guns. The trial court also limited the officers' testimony about the guns. Defense counsel objected when the prosecution began questioning one of the officers about the rifles, and the trial court sustained the objection, holding, "The rifles aren't relevant. Move to the handguns."[5] Most of the officers' testimony concerned the Springfield ammunition and paraphernalia that was found. As to the other guns, one officer testified as follows: "I had conducted a records check and determined that [defendant] had five registered firearms in his name. We located five registered firearms inside the safe. [¶] . . . [¶] We located a revolver. It was a six-shot revolver. I believe .32-caliber. [¶] We located a .45-caliber Glock semiautomatic pistol. [¶] And we located an AR-style pistol. And then a .308 rifle and another AR-style rifle." Another officer testified they found "a Glock .45" "[i]n a metal locked cabinet in the master bedroom" along with Glock ammunition and a magazine; "a Smith and Wesson revolver" "in a zippered case with bags of ammo"; and a .556-caliber "pistol" that "looks similar to . . . an AR-15" with accompanying ammunition and

---

[5] Witnesses testified defendant shot Cruz with a "handgun" or a "pistol."

12

magazines.  The officers also testified about how they determined the .45-caliber Glock was not the gun used in the shooting.  That is the extent of the officers' testimony about other guns.

Defendant complains this evidence portrayed him as a "crazy, trigger-happy, hot-headed 'gun nut.' "  We disagree.  The police testified each of the guns was registered to defendant, and the prosecutor twice acknowledged this fact during his closing argument.  The police also testified the guns were found inside a locked gun safe.  Far from portraying defendant as a trigger-happy gun nut, this evidence was equally likely to portray him as a responsible and law-abiding gun owner.  Moreover, and as quoted above, the prosecution's closing argument did not attempt to portray defendant as a trigger-happy gun nut, and instead explained how the other guns help prove defendant shot Cruz with a Springfield .45-caliber gun and then hid it.

We are also not convinced that the limited evidence about other guns was prejudicial within the meaning of Evidence Code section 352.  " ' " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.  In applying section 352, "prejudicial" is not synonymous with "damaging." ' [Citation.]" [Citation.]  . . .  " 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors. [Citation.]' [Citation.]" [Citation.]  In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.' "  (*People v. Doolin* (2009) 45 Cal.4th 390, 439; see also *People v. Robinson* (2005) 37 Cal.4th 592, 632 [evidence creates "undue prejudice" when it " 'uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues' "].)  The officers' limited testimony about

13

finding other guns while executing a search warrant was not uniquely likely to evoke an emotional bias against defendant or inflame the emotions of the jury.

Given how limited the evidence was, and the purpose for which it was admitted, we are not convinced its probative value was substantially outweighed by the probability its admission would create a substantial danger of undue prejudice. We thus cannot say the trial court abused its discretion in admitting the challenged evidence over defendant's Evidence Code section 352 objection.

Even if we were to assume the trial court abused its discretion in admitting the evidence, we find the error was not prejudicial to defendant.

Courts utilize two different tests to determine whether an error was prejudicial—the *Chapman* beyond-a-reasonable doubt standard, and the *Watson* reasonable probability standard. Under the *Chapman* test, an error will be found prejudicial, and thus reversible, unless the court finds "beyond a reasonable doubt" that the error did not contribute to the verdict. (*Chapman v. California* (1967) 386 U.S. 18, 24.) The *Chapman* test only applies if the error involves a right protected by the United States Constitution. Here, defendant argues the admission of evidence about other guns violated his federal constitutional right to due process. "[T]he admission of evidence . . . results in a due process violation only if it makes the trial *fundamentally unfair*." (*People v. Partida* (2005) 37 Cal.4th 428, 439.) "To prove a deprivation of federal due process rights, [the defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. '*Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process.*' " (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229, italics added.) As we have discussed above, there were permissible inferences the jury could draw from the evidence—namely, it buttressed the prosecution's theory that defendant shot Cruz with a Springfield .45-caliber gun and then got rid of the gun, thus suggesting defendant knew

he did not shoot Cruz in self-defense. The admission of the challenged evidence thus did not violate due process, and the *Chapman* test does not apply.

Instead, we find the harmless error test pronounced in *People v Watson* applies. Under the *Watson* test, an error will be found prejudicial, and thus reversible, only if the court, " 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836; see also *People v. Partida, supra*, 37 Cal.4th at p. 439 [under the *Watson* test a "reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error"].) We find it is not reasonably probable defendant would have received a more favorable verdict had the challenged evidence been excluded.

Defendant's argument to the contrary, this was not a particularly close case as to the assault with a firearm charge on which he was convicted. Defendant admits he shot Cruz with a firearm, and the only issue was whether he did so in self-defense. The jury found he did not, and the evidence supports this.

The jury was given several instructions on self-defense. For example, the jury was given CALCRIM No. 3471, which instructs: "A person who engages in mutual combat or who starts a fight has a right to self-defense only if: [¶] 1. He actually and in good faith tried to stop fighting; [¶] 2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting; [¶] and [¶] 3. He gave his opponent a chance to stop fighting. [¶] If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight. [¶] . . . [¶] A fight is *mutual combat* when it began or continued by mutual consent or agreement." At a minimum, defendant engaged

15

in mutual combat with Cruz,[6] which means he had a right to use self-defense only if he tried to stop fighting and gave Cruz a chance to stop fighting. He did not. Instead, he *escalated* an altercation that began with taunting, posturing, and chasing—first by going into his house to get a baseball bat, and then by going back into his house and getting a gun. Moreover, Cruz was not continuing to fight when defendant shot him. Instead, he had dropped the scraper and gone back to work.

The jury was also given CALCRIM No. 3470, which instructs that a defendant acts in lawful self-defense only if: (1) he "reasonably believed that he was in imminent danger of suffering bodily injury or was in imminent danger of being touched unlawfully"; (2) he "reasonably believed that the immediate use of force was necessary to defend against that danger"; and (3) he "used no more force than was reasonably necessary to defend against that danger." The evidence does not support that defendant acted in lawful self-defense. At the time he shot Cruz, Cruz was unarmed and was approximately 20 feet away, and thus posed no imminent danger to defendant and there was no reason for defendant to use immediate force to defend against danger. It is true that Cruz had previously picked up a metal scraper to defend himself when defendant came at him with a baseball bat, and we will assume the metal scraper was capable of inflicting serious bodily injury; indeed, we will assume it could be a deadly weapon.[7] However Cruz testified without contradiction that he dropped the metal scraper when

---

[6] The evidence also supports a finding that defendant was the one who started the fight. It was defendant who came out and started making fun of the beating Cruz's son had received the day before; it was defendant who then went into his house and came back out with a bat; and it was defendant who again went into his house and came back out with a gun.

[7] It appears the metal scraper and pictures of it were admitted into evidence, but we have not been provided with the exhibits so we are not clear on what it looks like. Based on descriptions of it during closing arguments, it appears it had something like a "razor blade" on one end, and it was three or four feet long.

16

defendant swung the bat at him, and that he was not holding the metal scraper or anything else when defendant shot him. It thus would not have been reasonable for defendant to believe *at the time he fired the gun* that he was in imminent danger of being harmed by Cruz or that immediate force was necessary to defend against danger. Moreover, using a gun on an unarmed person is more force than reasonably necessary.

The jury was also given CALCRIM No. 3474, which instructs, "The right to use self-defense continues only as long as the danger exists or reasonably appears to exist. When the attacker withdraws or no longer appears capable of inflicting any injury, then the right to use force ends." Again, because Cruz had dropped the metal scraper and gone back to work, any danger he might once have posed no longer existed, and defendant's right to use force ended. Instead of ending the altercation, however, defendant ran into his house, grabbed a gun, and ran back out and shot Cruz. To the extent defendant might have believed he was justified in shooting Cruz because Cruz could still pick up the metal scraper and harm him with it, the jury was instructed, "Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be." (CALCRIM No. 3470.)

Finally, the jury was instructed, "A defendant is not required to retreat. He is entitled to stand his ground and defend himself and, if reasonably necessary, to pursue an assailant until the danger of death or bodily injury has passed. This is so even if safety could have been achieved by retreating." (CALCRIM No. 3470.) Here, however, defendant did *not* "stand his ground and defend himself." Even if he was not required to do so, he retreated to the safety of his house not once but twice. As the prosecutor (accurately) noted during his closing argument, "There is no evidence that . . . Cruz ever went into the Defendant's house. Ever followed the Defendant into his house. No evidence of that. Not even a shred." Rather than staying in his house (where he was in *no* imminent danger of injury), defendant first grabbed a baseball bat, went back outside, and tried to hit Cruz with it. Then, he retreated to the safety of his house a second time,

17

and rather than staying there, he grabbed a gun, went outside, and shot a now unarmed man. That is not self-defense.

Having examined the entire cause, including the evidence, we find it is not reasonably probable defendant would have received a more favorable verdict if the evidence about other guns had been excluded. Even assuming, for argument's sake, that the trial court erred in admitting such evidence, we find no prejudice.

## II

### *Prosecutorial Misconduct*

During closing arguments, the prosecutor stated defense counsel "dragged our victim Mario Cruz through the mud" during his closing argument. Defendant did not object.

On appeal, defendant argues this comment constituted "prosecutorial misconduct" "because it insinuated that defense counsel acted dirty and unscrupulously," and was thus a "highly inappropriate" "attack on the credibility of defense counsel" and "malign[ed] defense counsel's character." He further argues this misconduct constitutes prejudicial error and requires reversal of his conviction. We disagree, for several reasons.

First, because defendant did not object to the comment or request a curative instruction or admonishment, he has forfeited appellate review of his misconduct claim. (*People v. Riel* (2000) 22 Cal.4th 1153, 1212.) "A defendant's 'failure to object and request an admonition waives a misconduct claim on appeal unless an objection would have been futile or an admonition ineffective.' " (*People v. Jackson* (2016) 1 Cal.5th 269, 367.) Defendant argues he has not waived his misconduct claim because an admonition would have been ineffective. Here is the entirety of his argument on this issue: "Once the prosecutor disparaged trial counsel's credibility, the prosecutor's insinuation that [defendant's] entire defense was based on an unscrupulous attack on 'our victim' was firmly implanted in the jurors' minds and no admonition by the trial court could possibly have cured the harm." We need not, and do not, address claims like this

18

one that are perfunctorily asserted without reasoned legal analysis. (*People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2 [reviewing court need not discuss claims that are "perfunctorily assert[ed]" or insufficiently developed]; *Jefferson Street Ventures, LLC v. City of Indio* (2015) 236 Cal.App.4th 1175, 1196, fn. 2 ["In view of the City's failure to present any reasoned legal analysis of the point, we deem the contention waived"]; *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 [appellate court need not address issues presented "without pertinent argument or an attempt to apply the law to the circumstances of this case"].) We thus find defendant's prosecutorial misconduct claim is forfeited.

Anticipating our conclusion, defendant argues his attorney's failure to object to the prosecutor's argument constituted ineffective assistance of counsel. We disagree. " 'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. [Citations.] A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. [Citations.] If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation.' " (*People v. Gamache* (2010) 48 Cal.4th 347, 391.) "[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502; accord *People v. Boyette* (2002) 29 Cal.4th 381, 424; *People v. Bernal* (2019) 42 Cal.App.5th 1160, 1169.) This is not one of those rare cases, because defense counsel could

19

reasonably have concluded an objection would only focus the jury's attention on the prosecutor's statement or offend or annoy the jury. (See *People v. Huggins* (2006) 38 Cal.4th 175, 206 [rejecting ineffective assistance claim where counsel's failure to object could be explained as tactical decision not to draw jurors' attention to prosecutor's comments]; *People v. Harris* (2008) 43 Cal.4th 1269, 1290 ["counsel could also have decided that objecting would focus the jury's attention on the threat incident in ways that would not be helpful to the defense"]; *People v. Welch* (1999) 20 Cal.4th 701, 754 [defense counsel "could reasonably have determined that the risks of raising the objection and offending or annoying the jury outweighed whatever benefit might have been obtained"].)

Even if the claim were not forfeited, we would find no misconduct. As defendant accurately notes, it is misconduct for the prosecutor "to impugn the integrity of defense counsel or to suggest defense counsel has fabricated a defense," (*People v. Cash* (2002) 28 Cal.4th 703, 732), or to make "personal attacks on the integrity of opposing counsel," (*People v. Espinoza* (1992) 3 Cal.4th 806, 820), or to use " ' " ' "deceptive or reprehensible methods to attempt to persuade either the court or the jury," ' " ' " (*People v. Hill* (1998) 17 Cal.4th 800, 819). Here, however, the prosecutor's comment that defense counsel "dragged our victim Mario Cruz through the mud" did not denigrate or impugn the integrity of defense counsel or suggest he had fabricated a defense, and it was neither deceptive nor reprehensible.

This was a self-defense case. During closing argument, defense counsel supported defendant's self-defense claim by arguing Cruz was the aggressor and was holding a deadly weapon and threatening defendant with it when the shots were fired. Because this argument directly contradicted Cruz's testimony, defendant's attorney also argued that Cruz was not credible, that he gave testimony "that can't be true," and that he "changed his testimony a number of times." "In addressing a claim of prosecutorial misconduct . . . , we view the prosecutor's comments in relation to the remarks of defense counsel,

20

and inquire whether the former constitutes a fair response to the latter." (*People v. Frye* (1998) 18 Cal.4th 894, 978, disapproved on another ground in *People v. Doolin, supra*, 45 Cal.4th at p. 421 & fn. 22.) Given defense counsel's attempt to convince the jury that Cruz was the aggressor and that his testimony to the contrary was not credible, we find the prosecutor's brief comment was a fair response.[8]

### III

### *Assessments and Fines*

At the sentencing hearing, the trial court stated it was imposing a restitution fine and a suspended restitution fine in the amount of $1,000, and victim restitution to the California Victim Compensation Board in the amount of $40,976.48. It also stated, "Beyond the restitution fine and the restitution that I am ordering directly, I am not imposing any fee or fine that isn't mandatory, and I am not imposing any fee or fine above the minimum." The sentencing minutes and the abstract of judgment included the restitution fines and the victim restitution, and also included the mandatory $40 court operations assessment (§ 1465.8) and the mandatory $30 criminal conviction assessment (Gov. Code, § 70373). Defendant argues the two mandatory assessments must be stricken because they were not expressly imposed by the trial court at the sentencing hearing. Citing *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), he also argues the restitution fines and the assessments must be stricken or stayed because they were imposed without consideration of his ability to pay. We disagree with both arguments.

A. *Mandatory assessments*

Section 1465.8, subdivision (a)(1), provides, "an assessment of forty dollars ($40) *shall* be imposed on every conviction for a criminal offense" (italics added), and

---

[8] Having rejected defendant's prosecutorial misconduct claim, we also reject his cumulative impact claim because "there is nothing to cumulate." (*People v. Johnson* (2016) 62 Cal.4th 600, 654.)

Government Code section 70373, subdivision (a)(1), provides, "an assessment *shall* be imposed on every conviction for a criminal offense . . . . The assessment *shall* be imposed in the amount of thirty dollars ($30) for each misdemeanor or felony" (italics added). As can be seen by the use of the word "shall," both assessments are mandatory, and the trial court has no discretion not to impose them. (See *People v. Standish* (2006) 38 Cal.4th 858, 869 [word "shall" ordinarily interpreted as mandatory]; *People v. Robinson* (2012) 209 Cal.App.4th 401, 405 [trial courts must impose both assessments].)

Defendant notes the trial court did not *expressly* mention either assessment at the sentencing hearing, and he cites the rule that "[w]here there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls," and the related rule that "[t]he clerk cannot supplement the judgment the court actually pronounced by adding a provision to the minute order and the abstract of judgment." (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385, 387-388.) Defendant thus argues that because the trial court did not expressly mention either assessment at the sentencing hearing, it must have decided not to impose either assessment, and the clerk thus erred in including them in the minute order and the abstract of judgment. We disagree with defendant's argument that the trial court must have decided not to impose the assessments because, as just noted, both assessments are mandatory, and the trial court had no discretion not to impose them. However, because the trial court failed to orally impose these two assessments at the sentencing hearing, the sentence is unauthorized, and we will correct the error and modify the oral pronouncement of judgment to include them. (*People v. Smith* (2001) 24 Cal.4th 849, 852-853; *People v. Scott* (1994) 9 Cal.4th 331, 354; *People v. Turner* (2002) 96 Cal.App.4th 1409, 1413.) Because the sentencing minutes and abstract of judgment already include both assessments, they need not be amended.

B. *Ability to Pay*

In *Dueñas*, the court held it violated due process to impose court fees and assessments without a determination of the defendant's ability to pay, and execution of a restitution fine must be stayed until the trial court holds a hearing and concludes the defendant has the present ability to pay the fine. (*Dueñas, supra*, 30 Cal.App.5th at pp. 1164, 1168.) Based on *Dueñas*, defendant argues the imposition of the $1,000 restitution fine and the two mandatory assessments without determining whether he had the ability to pay them violated due process.

Defendant forfeited his right to raise this issue on appeal because he did not object to the imposition of fines and assessments in the trial court. "Ordinarily, a criminal defendant who does not challenge an assertedly erroneous ruling of the trial court in that court has forfeited his or her right to raise the claim on appeal." (*In re Sheena K.* (2007) 40 Cal.4th 875, 880.) This rule applies to alleged sentencing errors, including the imposition of fines and assessments. (*People v. Trujillo* (2015) 60 Cal.4th 850, 856-861 [defendant forfeited challenge to booking fee by failing to object in trial court]; *People v. Gamache, supra*, 48 Cal.4th at p. 409 [defendant forfeited challenge to restitution fine by failing to object in trial court].) This rule has recently been applied to the failure to raise a *Dueñas* argument in the trial court. (*People v. Lowery* (2020) 43 Cal.App.5th 1046, 1052-1053 [*Dueñas* arguments forfeited by failure to raise in trial court]; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153-1155 [same].) Moreover, as to the $1,000 restitution fine in particular, section 1202.4 allows the trial court to consider the defendant's ability to pay when imposing a fine above the $300 statutory minimum. (§ 1202.4, subd. (c).) Here, the trial court imposed a restitution fine above the statutory minimum, and defendant thus could have objected to that fine based on an inability to pay, but he failed to do so. By failing to raise a *Dueñas* argument at his sentencing hearing, defendant forfeited the right to raise the issue on appeal.

23

Defendant argues in the alternative that if we find his *Dueñas* claim was forfeited, then the failure to raise it in the trial court constituted ineffective assistance of counsel. We need not decide whether the failure to raise a *Dueñas* argument below constituted ineffective assistance because, "we join those authorities that have concluded the principles of due process do not require determination of a defendant's present ability to pay before imposing the fines and assessments discussed in *Dueñas*."[9] (*People v. Pack-Ramirez* (2020) 56 Cal.App.5th 851, 860 [citing cases].)

## DISPOSITION

The oral pronouncement of judgment is modified to include the mandatory $40 court operations assessment (§ 1465.8) and the mandatory $30 criminal conviction assessment (Gov. Code, § 70373). As modified, the judgment is affirmed.

/s/
EARL, J.

We concur:

/s/
HULL, Acting P. J.

/s/
KRAUSE, J.

---

[9] Our Supreme Court is poised to resolve the issue, having granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844, to decide the following questions: "Must a court consider a defendant's ability to pay before imposing or executing fines, fees, and assessments? If so, which party bears the burden of proof regarding defendant's inability to pay?"

24